

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| CHRISTOPHER WAYNE SCRANTON, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 4:15-CV-328-A |
| | § | |
| LORIE DAVIS, Director,[1] | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION
### and
### ORDER

This is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, Christopher Wayne Scranton, a state prisoner incarcerated in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ) against Lorie Davis, Director of TDCJ, respondent. After having considered the pleadings, state court records, and relief sought by petitioner, the court has concluded that the petition should be dismissed as time-barred.

### I. Factual and Procedural History

On June 26, 2009, in Tarrant County, Texas, a jury found

---

[1] Effective May 4, 2016, Lorie Davis replaced William Stephens as director of the Correctional Institutions Division of the Texas Department of Criminal Justice. Pursuant to Federal Rule of Civil Procedure 25(d), Davis is automatically substituted as the party of record.

petitioner guilty on two counts of aggravated robbery with a deadly weapon, and, on July 6, 2009, the trial court assessed his punishment at fifty years' confinement on each count. (Adm. R., Clerk's R. 108, 111, ECF No. 10-13) Petitioner appealed his convictions, but the Second District Court of Appeals of Texas affirmed the judgments, and, on December 15, 2010, the Texas Court of Criminal Appeals refused his petition for discretionary review. (*Id.*, Docket Sheet, ECF No. 10-2) Petitioner did not seek writ of certiorari. (Pet. 3, ECF No. 1) Therefore, the judgments of conviction became final ninety days later on March 15, 2011. *Flanagan v. Johnson*, 154 F.3d 196, 197 (5th Cir. 1998); SUP. CT. R. 13. On February 27, 2012, petitioner filed a state habeas application challenging his convictions, which was denied by the Texas Court of Criminal Appeals on August 21, 2013, without written order on the findings of the trial court.[2] (Adm. R., State Writ cover, 12, ECF No. 10-22) This federal petition was filed on April 29, 2015.[3] (Pet. 10, ECF No. 1)

---

[2] Petitioner's state habeas application is deemed filed when placed in the prison mailing system. *Richards v. Thaler*, 710 F.3d 573, 578-79 (5th Cir. 2013). The application does not provide the date petitioner placed the document in the prison mailing system, however the "Inmate's Declaration" on page 11 of the application reflects the date the application was signed by petitioner. For purposes of this opinion, petitioner's state habeas application is deemed filed on that date.

[3] Similarly, petitioner's federal habeas petition is deemed filed when placed in the prison mailing system. *Spotville v. Cain*, 149 F.3d 374, 377 (5th

2

The state appellate court set forth the factual background of the case as follows:

> Around midnight on May 10 going into May 11, 2008, Appellant parked his red F-150 pickup truck on the side of the Joy Game Room, a gaming establishment at the corner of South Collins and East Mayfield in Arlington.
>
> Marcus Linton spent five days a week at the game room, sometimes helping out with odd jobs such as cleaning up and re-stocking the refrigerator. On May 10, he had been helping set up a security camera when around 2:00 a.m., closing time, he stepped out front to move the car he had borrowed to the alley in the back so that passers-by would not think that the business was still open while he stayed to play some of the machines after hours.
>
> As he wheeled the car around to the alley, he passed near Appellant's red pickup truck backed up against the building. The truck's "dim" lights were on and two people were in the front seat: a black man sitting upright behind the steering wheel and someone else bent down in the passenger seat beside him.
>
> Marcus thought it was "not normal" for a vehicle to be parked that way and on that side of the building at that time of night. As he passed the front of the truck, the passenger's face was below his line of sight and the driver acted as though he wanted to avoid being noticed.
>
> Marcus continued into the alley, parked behind the building, climbed out of the car, and tapped on the game room's back door. Someone let him in, and after stepping inside and locking the door behind him, he realized that he had left a friend's cell phone in the car. He turned to unlock the door, and when he set foot outside, he saw two people standing close by. He

---

Cir. 1998).

immediately retreated inside and tried to close the door when a pair of hands grabbed hold from the outside.

Riley Kemp was the manager in charge of the late shift. Standing in the doorway between the main and back areas, he turned from the customer he had been assisting to see Marcus struggling to close the back door.

Marcus had almost succeeded when another pair of hands from the outside grabbed the door. But Marcus released his grip when the muzzle of a handgun penetrated the opening and pressed against his forehead.

For a moment, Marcus locked eyes with the man holding the gun. Then, fearing that he was either going to be hurt or killed, Marcus stepped aside and two gunmen (the second armed with a shotgun) threw the door open and burst inside.

The intruders, bundled up in multiple layers and hooded sweats, trained their weapons at Marcus and Kyong Son, a seventy-year old employee who had been helping clean up, and ordered them face-down on the floor.

Watching from the main area of the game room, Riley called 911 and began quietly escorting the fifteen or so customers toward the front entrance and out of the building. As Riley talked with the 911 dispatcher, the men in the back realized that the keys to the money were evidently on the opposite side of the building with Riley at the front entrance. Frantically looking for something to steal, they kicked open the locked office door located in the back area. Finding nothing valuable there, one of the men snatched the wallet from Son's back pants pocket, stripped it of its sixty dollars in cash, and stuffed it back in Son's pants. Then they made for the back door, slammed it shut, and dashed through the alley.

4

Riley hurried to the back, opened the door, and instructed Marcus to see if he could tell where the men went. Marcus took off running down the alley.

The robbers barreled north along the wooden privacy fence that extended behind the game room toward Mayfield Street. Marcus followed on the opposite sidewalk as they circled back onto Mayhill Court and continued south down that street, disappearing through an open gate between two houses at the end of the cul-de-sac. Within seconds, a patrol car pulled up to Marcus, who climbed in and collapsed onto the backseat.

Another patrol car stopped at the end of the cul-de-sac, and Officer Robert Muguerza climbed out and entered the backyard where the robbers had disappeared. He spotted two suspects in the large open field across the fence. They ran west, crossing Collins and a church parking lot before vanishing into the adjoining neighborhood.

The officer who had picked up Marcus returned him to the game room, asking on the way whether Marcus would be able to recognize the robbers if he saw them again. Marcus replied that he would "because that's all I remembered was the face."

In the game room parking lot, officers ran a license check of the red pick-up truck backed up against the building; it was registered to Appellant.

The police set up a containment perimeter encircling several blocks around the game room. Officer Frank Smith had taken a position northwest of the game room when he heard that a suspect had been seen running northbound on Collins. He headed that way and picked up Lehman Mintor running northbound on the west side of the street.

The officer took Lehman to the game room parking lot and presented him to Marcus for a field show-up. Illuminated by bright lights and wearing handcuffs behind his back, he stood approximately twenty yards

5

from Marcus, who was hidden behind the lights. Marcus could not identify him.

In the meantime, Officer Muguerza and his police dog had relocated to Shea Court, just to the west of the church grounds where the suspects had last been seen. The dog sniffed out Eddie Beasley, who was barefoot, wearing only a T-shirt and shorts, hiding in a flower bed. Officers took Eddie into custody and transported him to the game room parking lot where he was presented to Marcus in the same manner that Lehman had been a half hour before. Marcus immediately recognized him as one of the robbers.

After Lehman had been cleared for release, Officer Smith was taking him south on Collins when he saw another suspect in a white T-shirt and jeans running northbound through the church grounds from the wooded area where Eddie Beasley had been tracked. Officer Smith radioed the suspect's position and description, dropped off Lehman, and took up a position on the south perimeter.

A 911 caller reported seeing someone running and crouching behind fences in a neighborhood to the northwest of the game room. Officer Smith drove to that location and saw the same suspect he had seen running on Collins-now without a shirt and with his jeans ripped-coming out of a backyard at 408 Thomas Lane. Officer Smith cruised up from the rear with his lights off. When the suspect noticed the patrol car, he started jogging. Pulling up alongside, Officer Smith asked him what he was doing, to which he replied that he was going for his "morning jog." When the suspect identified himself as Appellant, Officer Smith recognized the name from the license-plate check of the pickup truck at the game room. Officer Smith ordered Appellant into the patrol car and transported him to the game room parking lot where he was presented to Marcus for a field show-up in the same manner as Lehman Mintor and Eddie Beasley had been before. Marcus immediately and unequivocally identified Appellant as the gunman with whom he had earlier locked eyes at the

6

back door of the game room.

    Crime scene investigators discovered a .45 caliber handgun and a sawed off .410 shotgun in the field behind the fence where Marcus had chased the robbers. Inside the fence, officers also found several articles of clothing, including hooded jackets and gloves. Subsequent DNA testing of the clothing matched some of the articles to Eddie Beasley and some to Appellant.

(Adm. R., Op. 2-7, ECF No. 10-4)

## II. Issues

Petitioner raises six grounds for relief:

(1)    The trial court admitted eyewitness-identification testimony in violation of due process;

(2)    The evidence was legally and factually insufficient in violation of due process;

(3)    He is innocent of the crime for which he was convicted and incarcerated in violation of the Eighth Amendment;

(4)    The state knowingly used perjured testimony in violation of the Sixth Amendment;

(5)    He was denied effective assistance of counsel in violation of the Sixth Amendment; and

(6)    He was convicted on both counts for the same theft in violation of the Double Jeopardy Clause.

(Pet. 6-7, 11, ECF No. 1)

## III. Statute of Limitations

Respondent contends the petition is untimely. Title 28, United States Code, § 2244(d) imposes a one-year statute of

7

limitations on federal petitions for writ of habeas corpus filed by state prisoners. Section 2244(d) provides:

> (1) A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitations period shall run from the latest of—
>
>     (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
>     (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
>     (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
>     (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitations under this subsection.

28 U.S.C. § 2244(d)(1)-(2).

Under subsection (A), applicable to this case, the limitations period began to run from "the date on which the

8

judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Petitioner's judgments of conviction became final by the expiration of the time he had for filing a timely petition for writ of certiorari in the United States Supreme Court on March 15, 2011, triggering the limitations period, which expired one year later on March 14, 2012,[4] absent any tolling.

Tolling of the limitations period may be appropriate under the statutory-tolling provision in § 2244(d)(2) and/or as a matter of equity. Under the statute, petitioner's state habeas application tolled the limitations period for 542 days, making his federal petition due on or before September 7, 2013. *Lookingbill v. Cockrell*, 293 F.3d 931, 934 (5th Cir. 2002); *Emerson v. Johnson*, 243 F.3d 934, 935 (5th Cir. 2001). Thus, this petition filed on April 29, 2015, is untimely unless petitioner is entitled to equitable tolling.

Equitable tolling is permitted only in rare and exceptional circumstances when an extraordinary factor beyond a petitioner's control prevents him from filing in a timely manner or he can make a convincing showing that he is actually innocent of the crime for which he was convicted. *McQuiggin v. Perkins*, — U.S. —,

---

[4] 2012 was a leap year.

9

133 S. Ct. 1924, 1928 (2013); *Holland v. Florida*, 560 U.S. 631, 649 (2010). In *McQuiggin,* the Supreme Court held that a prisoner filing a first-time federal habeas petition could overcome the one-year statute of limitations in § 2244(d)(1) upon a showing of "actual innocence" under the standard in *Schlup v. Delo,* 513 U.S. 298, 329 (1995). *McQuiggin*, 133 S. Ct. at 1932-33. "[T]enable actual-innocence gateway pleas are rare," and, under *Schlup*'s demanding standard, the gateway should open only when a petition presents "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.* at 1928; *Schlup*, 513 U.S. at 316. A habeas petitioner, who seeks to surmount a procedural default through a showing of "actual innocence," must support his allegations with "new, reliable evidence" that was not presented at trial and must show that it was more likely than not that, in light of the new evidence, no juror, acting reasonably, would have voted to find the petitioner guilty beyond a reasonable doubt. *Schlup,* 513 U.S. at 326-27. *See also House v. Bell,* 547 U.S. 518, 539-54 (2006) (discussing at length the evidence presented by the petitioner in support of an actual-innocence exception to the doctrine of procedural default under *Schlup*).

Petitioner provides no explanation for his delay. Instead, he asserts that he is actually innocent of the offenses. Pet. 9,

10

ECF No. 1; Pet'r's Traverse 5-13, ECF No. 16) He admits he has no *new* evidence of his innocence but urges that if he–

> presents record evidence of innocence so strong that the court cannot have confidence in the outcome of the trial unless the court is satisfied that the trial was free of non harmless constitutional error the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

Pet'r's Traverse 6, ECF No. 16.

Petitioner relies wholly on the record, arguing that the "record evidence of [his] innocence" includes conflicting, inconsistent and/or perjurious testimony at trial. In sum, he presents no new evidence, much less any evidence of the type or caliber referenced in *Schlup*. Therefore, he has not met "the threshold requirement" for *McQuiggin* to apply, *i.e.* a showing that "in light of the *new* evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin*, 133 S. Ct. at 1928 (quoting *Schlup*, 513 U.S. at 329 (emphasis added)). Accordingly, *McQuiggin* does not aid him.

Petitioner's federal petition was due on or September 7, 2013. His petition, filed on April 29, 2015, is, therefore, untimely.

For the reasons discussed herein,

It is ORDERED that the petition of petitioner for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, dismissed as time-barred. It is further ORDERED that a certificate of appealability be, and is hereby, denied.

SIGNED June **24**, 2016.

_____
JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE